Filed 9/30/16  In re U.N. CA1/3
Received for posting 10/3/16

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re U.N., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> M.M., <br><br> Defendant and Appellant. | A147251 <br><br> (City & County of San Francisco Super. Ct. No. JD153223) |

M.M., alleged father of three-year-old U.N., appeals from the juvenile court's jurisdictional and dispositional orders removing U.N. from his mother R.N.'s (Mother) care and placing him in a foster home.  He contends the court erred in:  (1) denying his request for biological father status; and (2) failing to give adequate notice under the Indian Child Welfare Act, 25 U.S.C. § 1901 (ICWA).  San Francisco Human Services Agency (Agency) concedes—and we conclude—there was ICWA error, but we reject M.M.'s remaining contention.  We therefore affirm the orders and remand the matter for the court to fully comply with ICWA's requirements.

1

## FACTUAL AND PROCEDURAL BACKGROUND

On July 27, 2015, the Agency filed a petition on behalf of U.N. and his half-sibling A.N[1] alleging U.N. was at risk due to Mother's substance abuse, physical abuse, and history of being in a relationship characterized by domestic violence with A.N.'s father, S.V. The petition listed M.M. as U.N.'s biological father.

According to the detention report, U.N. and A.N. were taken into protective custody on July 23, 2015, after Mother was seen grabbing U.N. roughly, dragging him, and throwing him down onto the pavement while pushing A.N. in a stroller down Market Street in San Francisco at 1:20 a.m. When officers arrived, they noted U.N. had multiple cuts and bruises over his face, neck, arm, hands and leg areas. Mother was intoxicated and did not seem to grasp what was going on. She was arrested, and U.N. was taken by ambulance to a hospital for medical evaluation.

A social worker interviewed Mother, who said M.M. was U.N.'s father but that Mother and M.M. were never married, had been in a relationship for three months before U.N. was conceived, and did not live together. M.M. did not sign U.N.'s birth certificate, was not involved in U.N.'s life, and did not provide child support. He lived in Modesto, but Mother did not have his phone number or address. Mother stated that she, U.N., and A.N. had lived with A.N.'s father, S.V., but that she had left with the children because of S.V.'s verbal abuse. She said she and S.V. pushed each other at times, and that their relationship involved domestic violence. Mother was cooperative and willing to participate in services to improve her parenting so she could reunify with her children. She asked that the maternal grandfather be considered for placement for the children. The social worker conducted a due diligence search for M.M. but was unable to locate him.

On July 28, 2015, the juvenile court detained U.N. and ordered that he remain in foster care. The court scheduled a "J1" hearing as to M.M. for August 11, 2015 and a

---

[1]A.N. is not a party to this appeal.

settlement conference for August 25, 2015.  The clerk of the court mailed notices of both hearings to M.M.—who was located in Modesto—by certified mail.

M.M. appeared at the August 11, 2015 hearing and was appointed counsel.  The juvenile court ordered a "paternity inquiry" and advised Mother and M.M. that if the petition is sustained and U.N. is declared a dependent of the court, reunification services will not exceed six months because U.N. was under the age of three at the time of the initial removal.  The court ordered Mother and M.M. to return to court for the August 25, 2015 settlement conference.

Mother filed a Dependency Parentage form, on August 13, 2015.  In response to the question, "Does a Judgment of paternity exist for your child/children?  (i.e. do you receive child support?  Have you ever been in family court for custody issues?)," Mother responded "yes" as to U.N.  She stated she and M.M. were not married or living together at the time U.N. was conceived and that M.M. had not filed a voluntary declaration of paternity and had not received U.N. into his home.  She stated M.M. had been ordered to pay child support but had not; he had "informally helped [with] costs here and there." She stated a "paternity test through child support" had shown "99.99% bio father" as to U.N.

On August 18, 2015, form JV-500, a Parentage Inquiry – Juvenile, was filed. Attached to the form was a December 18, 2014 Judgment Regarding Parental Obligations from the Merced County Superior Court ordering M.M. to pay $50 per month in child support to U.N.  The judgment stated M.M. was obligated to pay child support because paternity tests established he was U.N.'s biological father.

On August 21, 2015, the Agency filed a report in preparation of the jurisdictional and dispositional hearing. According to the report, M.M. told the social worker that he did not have a relationship with U.N.  He said he provided financial support "directly to [Mother]" and that "he has DNA testing results showing he is the biological father and will provide those."  Mother had previously reported she was 22 years old and M.M. was 46 years old when they were involved, and that M.M. was very violent and had threatened to kill her.

M.M. had an extensive criminal history and was a registered sex offender due to an arrest in 1986 for lewd lascivious acts with a child under 14 and a conviction for sexual penetration with a foreign object with force, for which he received a sentence of 32 months in prison. The report further stated: "He has [a] conviction for felony possession of explosive/etc/device/public in 1986. He has firearm arrests with felony convictions for grand theft from person 1989, for grand theft property in 1992 and a felony false imprisonment conviction in 1994 with a sentence of 52 months in prison, felony conviction of threaten crime in 1998, damage to prison and an arrest in 2013 for rape that was dismissed. He has numerous other arrests including probation violations." The report concluded: "The [Agency] recommends that no services be provided to [S.V.] and [M.M.] since they are alleged fathers who do not have relationships with the minors." An amended petition was filed on August 24, 2015, adding a number of allegations, including one that set forth M.M.'s criminal history.

At the August 25, 2015 hearing, M.M. "willfully failed to appear"—a finding the juvenile court made without prejudice. The court continued the matter to September 4, 2015, and ordered M.M. to appear. The clerk mailed notice of the rescheduled hearing date to M.M. and his counsel. M.M. again failed to appear for the September 4, 2015 hearing. The court rescheduled the hearing to 9:00 a.m. on November 4, 2015, and ordered M.M.'s attorney to advise M.M. to appear. The court also ordered a trial submission schedule and set a mandatory settlement conference for October 21, 2015. The clerk mailed notice of the settlement conference and rescheduled hearing date to M.M. and his counsel.

On October 15, 2015, the Agency filed an addendum report in which it provided updated information about Mother and the children. The Agency continued to recommend that no reunification services be provided to M.M. On October 21, 2015, the Agency and Mother filed their respective trial pleadings pursuant to the juvenile court's September 4, 2015 order. M.M. did not file any pleadings related to the trial.

On November 4, 2015, M.M. appeared at the jurisdictional and dispositional hearing at 11:45 a.m., during the cross-examination of the final witness, social worker

4

Laura Morgan.  Thereafter, M.M.'s attorney attempted to cross-examine Morgan, when the Agency's attorney objected, stating, "[M.M.] at this point is still alleged, and I believe that his rights are limited to notice and an opportunity to elevate his status . . . ."  M.M.'s attorney responded, "You're right.  He does have a right to try to elevate his status which I'm trying to do right now to the next step."  The court asked if a motion had been filed, and M.M.'s attorney responded, "No, there's been no motion filed yet . . . [M.M.] . . . entered the courtroom late this morning and he did provide me with a document from the DNA Diagnostic Center which states that his probability of paternity is 99.99 percent."  M.M.'s attorney stated he intended to ask Morgan just two questions—whether she had seen the DNA report, and if she and the Agency would stipulate to elevate M.M. to biological father status.

The Agency's attorney indicated she was not prepared to enter into such a stipulation.  She noted M.M. had been involved in the case for almost three months and had ample time to file a motion for presumed status, but had not done so.  She said she had just been presented with the DNA test—which apparently was available since June 2014—and that the issue of paternity was not properly before the court.  She noted that a biological father is not, in any event, entitled to reunification services or visitation, and that there were allegations against M.M. in the petition.

After significant back and forth between the juvenile court and counsel for all parties, the court stated it would not consider the paternity issue at that time because the parties had not briefed the issue and had not submitted any evidence regarding paternity prior to trial.  The court stated it would allow M.M. to contest the allegations that were made against him in the petition:  "With regards to the allegations I'm going to allow you to contest it.  And I can see it's regarding criminal history.  So we're at cross-examination, Mr. Bordelon [counsel for M.M.]."  M.M.'s counsel stated, "Your Honor, at this point I rest."  During closing arguments, M.M.'s attorney stated he objected "to any allegation being sustained against [M.M.] . . . based on the fact that . . . I have not been able to obtain discovery and have been precluded from meeting and conferring with counsel regarding this issue. . . ."

5

The juvenile court found true the allegations against M.M. regarding his criminal history based on the evidence presented in the social worker's reports. The court sustained the petition, removed U.N. from Mother's custody, and ordered reunification services for Mother.

## DISCUSSION

### *Biological Father Status*

M.M. contends the juvenile court erred in denying his request for biological father status. Assuming, without deciding, that the court erred, we conclude the error was harmless under any standard.

There are three types of fathers in juvenile dependency law: presumed, biological, and alleged. (*In re Kobe A.* (2007) 146 Cal.App.4th 1113, 1120.) A presumed father is a man who meets one or more specified criteria in Family Code section 7611 by, for example, marrying or attempting to marry the child's mother, executing a declaration of paternity, or receiving the child into his home and openly holding the child out as his natural child. (§ 7611, subds. (a), (b), (d).) A biological father is a man whose paternity has been established, but who has not shown he is the child's presumed father. An alleged father is a man who has not established biological paternity or presumed father status. (*In re Zacharia D.* (1993) 6 Cal.4th 435, 449, fn. 15.) These categories are meant "to distinguish between those fathers who have entered into some familial relationship with the mother and child and those who have not." (*In re Sabrina H.* (1990) 217 Cal.App.3d 702, 708.)

"Presumed father status ranks highest." (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 801.) Only a presumed father is entitled to appointed counsel, custody (if there is no finding of detriment) and reunification services. (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1209.) In contrast, a biological father is not entitled to these rights merely because he wants to establish a personal relationship with his child. (*In re Christopher M.* (2003) 113 Cal.App.4th 155, 160; *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 844 ["it is clear that the Legislature meant to provide natural [biological] fathers with far less rights than both mothers and presumed fathers have under California's statutory system"].) Thus, a

6

court may provide reunification services to a biological father only if it determines that services will "benefit the child." (Welf. & Inst. Code,[2] § 361.5, subd. (a).)

Here, M.M. does not assert he is a presumed father. Rather, his only argument is that he should have been deemed a biological father so that the juvenile court "could have ordered reunification services and visitation, which would then assist [him] in obtaining presumed father status." As noted, however, a biological father may receive reunification services only if the court determines that services will "benefit the child." (§ 361.5, subd. (a).) The record demonstrates M.M. would not have been able to make that showing. Thus, any error in failing to elevate M.M. to biological father status was harmless under any standard. (See *In re Kobe A.*, *supra*, 146 Cal.App.4th at p. 1121–1124 [the failure to provide an alleged father with notice of the proceedings deprived him of the opportunity to establish paternity, obtain reunification services, and ultimately seek placement of his son, but the error was harmless under any standard].)

M.M. and Mother were never married and did not live together. They had been in a relationship for only three months before U.N. was conceived, and according to the jurisdictional and dispositional report, Mother told a social worker that M.M. was very violent and had threatened to kill her. M.M. was not on U.N.'s birth certificate, had not signed a voluntary declaration of paternity, and had not received U.N. into his home. He had been ordered to pay child support but had not paid. There was no evidence he maintained any relationship with U.N. after his birth, and in fact, he told a social worker that he did not have a relationship with U.N. Moreover, he had an extensive criminal history spanning from 1986 to 2013 that included multiple arrests, convictions for possession of explosives and firearms, grand theft, false imprisonment, criminal threats, numerous probation violations, extended incarcerations, and a conviction for sexual offenses with a minor, which required him to be registered as a sex offender. (See *In re Kobe A.*, *supra*, 146 Cal.App.4th at p. 1123 [noting that the alleged father's "criminal history left the court with limited discretion to provide him with reunification services"].)

---

[2]All further references are to the Welfare and Institutions Code unless otherwise stated.

7

Moreover, after his initial appearance in the dependency proceedings on August 11, 2015, M.M. failed to appear at subsequent hearings despite being properly notified of the hearings. He did not file a motion to elevate his paternity status and never requested presumed father status. The juvenile court informed M.M. on August 11, 2015, that he would have only six months to reunify with U.N. if U.N. was declared a dependent of the court, but M.M. made no effort to contact the Agency after his initial interview or otherwise make any attempts to reunify with or even visit U.N. Rather, he was absent from the proceedings for almost three months and did not file any pleadings in preparation for the jurisdictional and dispositional hearings, to which he showed up two hours and 45 minutes late. " ' "Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring." ' " (*In re Christopher M., supra*, 113 Cal.App.4th at p. 160.) Based on M.M.'s criminal history and lack of relationship with or interest in U.N., there was no possibility the court would have found that awarding reunification services to M.M. would have been beneficial for U.N. Accordingly, M.M. was not prejudiced by the failure to change his paternity status.

### ICWA

### *Background*

In its July 28, 2015 detention report, the Agency indicated it had asked Mother whether either child had Native American ancestry. Mother "initially stated that the children may have paternal Native American ancestry, but she then changed her statement stating, 'Never mind, I don't think so.' " When M.M. first appeared in the case on August 11, 2015, the juvenile court stated, "as to the biological father ICWA may apply."

On August 13, 2015, M.M. filed an ICWA-20, Parental Notification of Indian Status in which he checked the box for "I may have Indian ancestry" and listed "Cherokee, Apache" as the names of tribes, and stated, "gm [grandmother] was Apache – Carmen [L.] from Stockton." In its dispositional report, the Agency stated, "The alleged father [M.M.] indicated he may be affiliated with an Indian tribe. The undersigned has

8

initiated the process to obtain further information and notify the BIA [Bureau of Indian Affairs] and tribe."

On September 21, 2015, the Agency filed and served by certified mail a Notice of Child Custody Proceeding for Indian Child, ICWA-030, to BIA, the Secretary of the Interior, and 11 tribes. Carmen's last name, L., was identified along with M.M.'s former legal name as M.L.M., but known information about Carmen—her name, city, and relationship to U.N.—was not listed on the form. All of the tribes responded that U.N. could not be identified as having tribal ancestry.

After the jurisdictional and dispositional hearing, the juvenile court set a hearing on December 10, 2015 for a progress report on ICWA findings. The hearing was continued to December 22, 2015, and at that hearing, the court determined ICWA did not apply.

*Analysis*

Appellant contends the Agency failed to fully comply with ICWA notice requirements because the notices "did not provide any information regarding the extended family members, nor is there any indication in the record that the social worker interviewed [M.M.], or his grandmother . . . or any other family members, to gather the information required to be provided in the notice in order for the BIA, Secretary, or tribes to verify [U.N.'s] eligibility for membership in a tribe." The Agency concedes—and we agree—the notice was inadequate.

Title 25 United States Code section 1912 provides: "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, [the Agency] . . . shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention." Section 224.2, subdivision (a)(1), similarly provides that notice to the tribe "shall be sent by registered or certified mail with return receipt requested." "[B]oth the federal ICWA regulations (25 C.F.R. § 23.11(d)(3) (2008)) and section 224.2, subdivision (a) require the agency to provide all known information concerning the child's parents, grandparents and great-grandparents."

9

(*In re Cheyanne F.* (2008) 164 Cal.App.4th 571, 576.)  If known, names (maiden, married, former, and aliases), current and former addresses, birth dates, places of birth and death, tribal enrollment numbers, and any other information is to be provided.  (*Id.* at p. 575, fn. 3.)  Notice given by the Agency under ICWA must contain enough information to permit the tribe to conduct a meaningful review of its records to determine the child's eligibility for membership.  (*In re S.E.* (2013) 217 Cal.App.4th 610, 615 [ICWA notice was inadequate because it did not include information about the child's great-great grandfather].)

Here, the ICWA notices did not include information about Carmen L., U.N.'s alleged great grandmother.  Thus, we conclude that a limited remand to the juvenile court with directions to order the Agency to fully comply with ICWA's inquiry and notice provisions is appropriate.  (*In re Christian P.* (2012) 208 Cal.App.4th 437, 452–453 [affirming dispositional order but remanding for ICWA compliance]; *In re Veronica G.* (2007) 157 Cal.App.4th 179, 187–188 [affirming jurisdictional order and remanding for ICWA compliance].)

**DISPOSITION**

The juvenile court's dispositional and jurisdictional orders are affirmed.  The matter is remanded to the juvenile court with directions to fully comply with the inquiry and notice provisions of ICWA, if it has not already done so.  After proper notice under ICWA, if it is determined U.N. is an Indian child and ICWA applies to these proceedings, U.N., Mother, and the tribe are entitled to petition the juvenile court to invalidate any orders that violated ICWA.  (25 U.S.C. § 1914.)  If, on the other hand, there is no such claim made, prior defective notice is deemed harmless error.

_____
McGuiness, P.J.

We concur:


_____
Pollak, J.


_____
Jenkins, J.